## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

ROLANDIS LARENZO CHATMON                               PETITIONER
ADC #140078

V.                        NO. 5:16CV00133-KGB-JTR

WENDY KELLEY, Director,                                RESPONDENT
Arkansas Department of Correction

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Kristine G. Baker. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the entry of this Recommendation. The failure to timely file objections may result in waiver of the right to appeal questions of fact.

## I. Introduction

Pending before the Court is a 28 U.S.C. § 2254 Petition for a Writ of Habeas Corpus filed by Petitioner, Rolandis Larenzo Chatmon ("Chatmon"), a prisoner in the Arkansas Department of Correction ("ADC"). Before addressing the merits of Chatmon's habeas claims, the Court will review the relevant procedural history of his underlying state court convictions.

1

In August 2013, a jury in Faulkner County, Arkansas convicted Chatmon of three counts of aggravated robbery and one count of theft of property. As a habitual offender with a firearm enhancement, he was sentenced to three life sentences for the aggravated robberies and a 360-month sentence for the theft of property, all to be served consecutively. *Trial R. at 104-07.* [1]

Chatmon appealed to the Arkansas Supreme Court, where he argued: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in admitting certain recorded phone conversations; and (3) the trial court erred in denying his motion for new trial. *Doc. 21-2.* On January 29, 2015, the Arkansas Supreme Court rejected Chatmon's arguments and affirmed his convictions. *Chatmon v. State*, 2015 Ark. 28, 467 S.W.3d 731 ("*Chatmon I*"). In doing so, the Court found that the following evidence was sufficient to support Chatmon's convictions:

> [O]n the evening of May 15, 2012, Derek Leidholm, his wife, Morgan, and their neighbor, Jansen McGuire, were in the garage of the Leidholms' house, when a man entered the garage, carrying a black semiautomatic pistol, and demanding money. After Jansen handed over a leather wallet, the man exited the garage from the left side, just as he had entered. Both Morgan and Jansen called 911 in separate calls. While they were doing so, Derek peeked around the corner of the garage and saw the man running "down the side … through the yards." Derek then saw a dark-color, midsize SUV proceed slowly through a stop sign without stopping, while the man ran beside it. After losing

---

[1] The four-volume record of Chatmon's pretrial and trial proceedings was filed as *Doc. 22.* All "Trial R." references are to Volumes 1, 2 and 3 of the record; "Supp. Trial R." references are to Volume 4, which contains transcripts of audio recordings played at trial.

sight of the SUV, Derek remained outside of his garage, and then saw the SUV again, this time moving at a high rate of speed.

After receiving a subject description and vehicle description, officers checked the area. Specifically, police were looking for a tall, thin black male wearing a white shirt, black jeans, and possibly a blue baseball cap and carrying a black semiautomatic pistol. In addition, police sought what was possibly a black SUV. In checking nearby apartment complexes, police discovered a dark-colored SUV parked in a slanted position with a driver and a passenger sitting inside. After approaching the vehicle, police discovered a tall, thin black male, wearing a white shirt and black jeans, who identified himself as Chatmon; Chatmon informed the police that he and his passenger, Rodney Chambers, were about to leave.

At that time, Crystal Brown, Chatmon's then girlfriend and the owner of the SUV, came outside and subsequently consented to a search of the car. Police searched the vehicle, and a hat and a black semiautomatic pistol were found. Police also searched a nearby trash dumpster and discovered Jansen's wallet sitting on top of the trash inside the dumpster.
      …

Detective David Short with the Conway Police Department testified that he investigated this case. He stated that he had spoken with both Brown and Chatmon and was able to recognize their voices and, in the course of the investigation had reviewed some recordings of phone calls made by Chatmon, while in jail, to Brown. These calls were then played for the jury. During one of the calls, Chatmon admitted that he had the gun in Brown's vehicle and had also kept it in her apartment at times. In another call, Chatmon was angry with Brown for allowing police to search her car. And, in yet another call, Chatmon admitted that on the night of the robbery he did not know why he did not get out of the car and go into the apartment as soon as he parked.

Finally, Monette Solomon testified that he met Chatmon while they were incarcerated together and that Chatmon told him he was in jail because he "had hit a lick." Solomon explained that was street slang for committing a robbery or burglary. Solomon also testified that Chatmon told him he used a .40–caliber handgun during that robbery

and that Rodney Chambers had driven the vehicle that Chatmon got into after the robbery. According to Solomon, Chatmon believed he would not be convicted for the crimes because the victims had described the gun as a .45–caliber weapon, when it was actually a .40–caliber handgun.

*Id.* at 1-2, 8, 467 S.W.3d at 733, 736.

On September 11, 2014, while Chatmon's direct appeal was pending, the judge who presided over his trial, Michael Maggio ("Maggio"), was removed from office due to judicial misconduct. *Judicial Discipline & Disability Comm'n v. Maggio*, 2014 Ark. 366, 440 S.W.3d 333. On January 9, 2015, Maggio pleaded guilty to one federal count of bribery in *United States v. Maggio*, E.D. Ark. No. 4:15cr00001-BSM.[2]

On February 25, 2015, Chatmon filed a *pro se* Rule 37 petition, in which he argued, *inter alia,* that his trial counsel was ineffective. *Doc. 21-5 at 27-35, 38-39, 49-52.* On June 16, 2015, the trial court entered an order denying the Rule 37 petition. *Id. at 77-78, 81-83.*

Chatmon appealed to the Arkansas Supreme Court. On March 17, 2016, the Court affirmed the trial court's decision denying Rule 37 relief. *Chatmon v. State*, 2016 Ark. 126, 488 S.W.3d 501 ("*Chatmon Rule 37*"). Chatmon then filed a Petition for Rehearing, elaborating on his claims of ineffective assistance of trial counsel.

---

[2]Maggio was later sentenced to ten years of imprisonment. On July 3, 2017, the Eighth Circuit Court of Appeals affirmed the conviction and sentence. *United States v. Maggio,* 862 F.3d 642 (8th Cir.), *cert. denied,* 138 S. Ct. 437 (2017), *reh'g denied,* 138 S. Ct. 732 (2018).

*Doc. 21-16.* On April 21, 2016, the Court summarily denied the Petition for Rehearing. *Doc. 21-18.*[3]

On May 2, 2016, Chatmon initiated this § 2254 habeas action, which asserts six broad grounds for habeas relief:

Claim 1:    His arrest was illegal.

Claim 2:    During the sentencing phase of his trial, the trial court erroneously allowed Tiffany Fisk to testify about "other crimes" Chatmon had committed.

Claim 3:    His trial attorney was ineffective because she:

    (a)    failed to investigate, discover and use exculpatory evidence from Rodney Chambers;

    (b)    failed to challenge admission of the handgun seized from the vehicle occupied by Chatmon when he was arrested;

    (c)    failed to adequately investigate and obtain evidence to impeach Monette Solomon, who testified that Chatmon "confessed" to him while they were incarcerated together;

    (d)    failed to adequately cross-examine other State witnesses;

---

[3]Chatmon also filed three petitions for writ of error *coram nobis* with the Arkansas Supreme Court. On July 1, 2015, while his Rule 37 appeal was pending, he filed a *coram nobis* petition alleging judicial bias and prosecutorial misconduct. *Docs. 21-19 & 21-21.* On November 5, 2015, the Arkansas Supreme Court denied the petition. *Chatmon v. State,* 2015 Ark. 417, 473 S.W.3d 542 (*"Chatmon ECN I"*).

On April 27, 2016, Chatmon filed a second *coram nobis* petition in which he expanded on his judicial bias claim based on matters that came to light in the judicial disciplinary proceedings against Maggio. *Doc. 21-25.* On June 2, 2016, the Arkansas Supreme Court denied the petition. *Chatmon v. State,* 2016 Ark. 236, 492 S.W.3d 867 (*"Chatmon ECN II"*).

Finally, on April 19, 2017, Chatmon filed a third *coram nobis* petition, alleging prosecutorial misconduct. *Docs. 82-1 & 82-2.* On August 3, 2017, the Arkansas Supreme Court denied the petition. *Chatmon v. State,* 2017 Ark. 229 (*"Chatmon ECN III"*).

(e)     failed to challenge Fisk's "other crimes" testimony during sentencing; and

(f)     failed to remove herself from his case after Chatmon made numerous complaints about her representation.

Claim 4:     The trial judge was "steeped in corruption," prosecution-oriented, and racially biased against him, all of which combined to deny him a fair trial.

Claim 5:     The trial court refused to appoint him "conflict-free" counsel after he complained about his attorney's representation, and failed to adequately inquire into the factual basis for his complaints.

Claim 6:     Prosecutorial misconduct occurred, in violation of his due process rights, because the prosecutor:

(a)     knowingly used perjured testimony from Solomon;

(b)     withheld exculpatory and impeachment evidence related to Chambers and Solomon;

(c)     misrepresented the nature of Fisk's "other crimes" testimony during sentencing;

(d)     failed to preserve and perform fingerprint testing on the victim's wallet and its contents;

(e)     fabricated inculpatory evidence;

(f)     failed to take remedial measures to mitigate the damaging effects of improperly admitted evidence; and

(g)     charged him based on a police investigation that had produced insufficient evidence to connect him to any crimes.

*Docs. 2, 6, 13, 31, 84, 89, 104.*

Respondent argues that Chatmon's habeas Petition should be dismissed because his claims: (1) are procedurally defaulted;[4] (2) are without merit; or (3) are not cognizable in a § 2254 habeas action. *Doc. 21.*

For the reasons discussed below, the Court recommends that all of Chatmon's claims be denied and the case be dismissed, with prejudice.

## II. Discussion

In addressing each of the grounds for habeas relief asserted by Chatmon, the Court will refer to his specific claims by the numbers that correspond to those claims as set forth on pages 5 and 6 of this Recommendation.

## A.    <u>Chatmon's "Illegal Arrest" (Claim 1)</u>

Chatmon argues that his arrest was "illegal" because it was based on "inaccurate, unreliable and insufficient" information and lacked probable cause. *Doc. 2 at 4; Doc. 6 at 1-2; Doc. 31 at 1-4.* Respondent contends that this claim is not cognizable in a federal habeas proceeding.

---

[4]A state prisoner must exhaust his available remedies in state court before seeking § 2254 relief in federal court. 28 U.S.C. § 2254(b)(1)(A). When a prisoner fails to fully exhaust his claims in state court and the time for doing so has expired, his claims are procedurally defaulted. *Coleman v. Thompson,* 501 U.S. 722, 731-32 (1991). A prisoner's § 2254 claims are also procedurally defaulted "when a state court has declined to address [the] claims because the prisoner had failed to meet a state procedural requirement" for presenting them. *Id.* at 729-30.

When a procedural default occurs, federal habeas review of the claim is barred unless the prisoner can demonstrate "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Id.* at 750.

The law is settled that alleged irregularities in an arrest do not provide a legal basis for collaterally attacking an otherwise valid conviction. *Gerstein v. Pugh,* 420 U.S. 103, 118-19 (1975); *Hale v. Lockhart,* 903 F.2d 545, 550 (8th Cir. 1990); *see also United States v. Crews*, 445 U.S. 463, 474 (1980) ("An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.").

As a matter of law, § 2254 does not permit Chatmon to collaterally attack his state court convictions based on an allegedly "illegal arrest." Accordingly, this habeas claim should be denied.

## B. Chatmon's Habeas Claims Related to Rodney Chambers (Claims 3(a) and 6(b))

In Claim 3(a), Chatmon argues that his trial attorney was ineffective for refusing to investigate and obtain "exculpatory" evidence from Chambers, and refusing to request a continuance so that Chambers could be called as a witness at trial. According to Chatmon, Chambers "exonerated" him in his statement to police by saying: (1) Chatmon did not rob anyone; (2) Chambers never saw Chatmon with a firearm or anything taken from the victims of the robbery; (3) Chatmon was never near the dumpster where the robbery victim's wallet was found; and (4) when they were arrested, Chatmon had just come from a woman's apartment in the complex, not from robbing three people at gunpoint. Chatmon contends that Chambers's

testimony could have "swung the case in Chatmon's favor." *Doc. 2 at 6; Doc. 31 at 6-7, 9-11.*

In Claim 6(b), Chatmon alleges that, although the police report referred to a recorded "interview" of Chambers being placed "in the case file," the statement's "exculpatory" contents were "suppressed" by the prosecution. *Doc. 2 at 10; Doc. 31 at 17; see Doc. 31 at 30 (police report).*

### 1.    Relevant State Court Proceedings

On August 8, 2013, the first day of Chatmon's trial, *his attorney* informed the court that: (1) the prosecutor had an "active subpoena out" to locate Chambers and call him as a *prosecution witness*; and (2) she had decided, as a matter of trial strategy, *not* to call Chambers as a defense witness:

> Mr. Chatmon [two days earlier] raised the issue that he wanted a continuance because that – Mr. Rodney Chambers was a necessary witness. As I advised Mr. Chatmon on that day Mr. Chambers has made a statement to the police. If the statement – if he would testify in the same manner as that statement, it would put him [Chatmon] in the area at the time that this aggravated robbery occurred. And I did not think due to trial strategy that we would want to do that. I do not think that at this point and time we would ever in any imagination put Mr. Chambers on the stand. *He [Chatmon] has asked me to ask the Court for a continuance. I again state that I would not put Mr. Chambers on the stand at this time, unless something has changed from the statement that he made to the police back in May of 2012.*

*Trial R. at 227-28* (emphasis added).

The prosecutor confirmed that, despite "a good faith effort," his office had been unable to locate Chambers, who he considered a "potential accomplice."

Although the prosecutor believed Chambers would "strengthen" their case, due to the "potential for inculpatory evidence" against Chatmon, he objected to a continuance because Chambers was "not a necessary witness for the State." *Id. at 228-29.*

Chatmon was then permitted to address the trial court. He stated that Chambers was a "material witness" who would testify that he "never [saw] me with a firearm or any other merchandise or items that was ... supposed to [have] been taken from these victims" and would say that he (Chambers) was the driver of the vehicle. *Id. at 229-30.* Chatmon's attorney reiterated that, "due to trial strategy," she would not call Chambers to testify because his testimony "would put [Chatmon] right in the neighborhood at the time that the crime occurred." *Id. at 230.*

The trial court denied Chatmon's request for a continuance on the ground that the case had been pending "for a long time" and it was "time to go to trial." *Id. at 230-31.*

In his Rule 37 Appeal Brief, Chatmon argued that his trial attorney had failed to conduct an adequate investigation and prepare for trial. He referred to his attorney's failure to use "exculpatory" statements from Chambers's pretrial interview, but provided no facts to support that self-serving allegation. *Doc. 21-6 at 80.* Relying on *Strickland v. Washington,* 466 U.S. 668 (1984), the Arkansas

Supreme Court held that Chatmon had failed to satisfy either of the essential elements necessary to sustain this ineffective assistance of counsel claim:

> Chatmon's assertions that counsel failed to conduct … a proper investigation lack factual substantiation sufficient to demonstrate that counsel's performance fell below an objective standard of reasonableness, or that he was prejudiced by counsel's alleged errors. … Where a petitioner alleges ineffective assistance for failure to perform an adequate investigation, he must identify what materials, witnesses, or evidence could have been uncovered by further investigation, and he must establish actual prejudice arising from this failure by demonstrating by a reasonable probability that the specific materials uncovered with further investigation could have changed the trial outcome. Chatmon does not identify what material could have been discovered by additional investigation, and, in the absence of such specific allegations, prejudice cannot be determined.

*Chatmon Rule 37*, 2016 Ark. 126, at 6, 488 S.W.3d at 505 (citations omitted).

In his first *coram nobis* petition, Chatmon argued that the prosecution had allegedly "withheld" Chambers's exonerating statement from the defense. The Arkansas Supreme Court rejected that claim:

> Suppression of material, exculpatory evidence by a prosecutor falls within one of the four categories of coram-nobis relief. *Barker v. State,* 2010 Ark. 354, 373 S.W.3d 865. … Chatmon contends that Chambers made statements to the police that exonerated him. Even if Chambers had made the statements as Chatmon contends, the defense was clearly aware that Chambers had made a statement. There was discussion on the record before the trial commenced about the prosecution's inability to locate Chambers for trial, and it is clear from the discussion that trial counsel was aware of the statement and what Chatmon contends Chambers said in it.

*Chatmon ECN I,* 2015 Ark. 417, at 5-6, 473 S.W.3d at 546.

## 2.    Trial Counsel's Alleged Failure to Investigate, Discover and Use Exculpatory Evidence from Chambers (Claim 3(a))

Respondent argues that, in Chatmon's Rule 37 appeal, the Arkansas Supreme Court reasonably adjudicated this ineffective-assistance claim. The Court agrees.

In affirming the denial of Chatmon's Rule 37 ineffective assistance of counsel claims, the Arkansas Supreme Court correctly identified and analyzed these claims under *Strickland*. *Chatmon Rule 37*, 2016 Ark. 126, at 4-5, 488 S.W.3d at 504-05. For Chatmon to obtain habeas relief on these ineffective-assistance claims, after the Arkansas Supreme Court has previously adjudicated them under the *Strickland* test, he must demonstrate that its application of the *Strickland* standard was "unreasonable," *i.e.*, its decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 101-03 (2011).

Meeting this high bar is a daunting task[5] and requires the habeas petitioner to show that: (1) counsel's representation fell below an objective standard of

---

[5]Where a state court has previously adjudicated a claim on the merits, a federal habeas court may grant habeas relief, on the adjudicated claim, in only three limited situations: the state court adjudication (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); (2) "involved an unreasonable application" of clearly established federal law, *id.*; or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington,* 562 U.S. at 101. "Surmounting *Strickland*'s high bar [for evaluating ineffective-assistance claims] is never an easy task," and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more

reasonableness; *and* (2) but for counsel's error, there is a reasonable probability that the result of the criminal proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694. The law is clear that the defendant "bears the burden to meet [*Strickland*'s] two standards." *Weaver v. Massachusetts,* 137 S. Ct. 1899, 1910 (2017).[6]

In rejecting these ineffective assistance of counsel claims, the Arkansas Supreme Court held that Chatmon had failed to provide *factual support* for his conclusory allegation that his trial counsel did not adequately investigate his case and discover exculpatory evidence. Nothing about that holding constituted an unreasonable application of *Strickland.*

In his § 2254 habeas papers, Chatmon attempts to cure the deficiencies noted by the Arkansas Supreme Court in rejecting his ineffective assistance of counsel claims.[7] However, even in the way he has asserted the revised version of these

---

difficult." *Id.* at 105 (citations omitted). The standards created by *Strickland* and § 2254(d) "are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.*

[6]*See Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (under *Strickland*, counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," with the burden to show otherwise "rest[ing] squarely on the defendant"); *Wong v. Belmontes,* 558 U.S. 15, 27 (2009) ("*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

[7]Chatmon presents *new arguments* in support of his § 2254 ineffective-assistance-of-trial-counsel claims that were *not* presented to the state courts at the appropriate time. Respondent does *not* argue that he has procedurally defaulted these new arguments. *See Doc. 21 at 16-20*. Thus, the Court will address those arguments as they are now articulated.

ineffective assistance of counsel claims, they still fall far short of satisfying the requirements of *Strickland*.

The trial transcript makes it clear that, before Chatmon's trial, his attorney knew about Chambers; knew that Chatmon thought Chambers was a "necessary witness"; knew the substance of Chambers's police statement; and made a *strategic determination* that Chambers would *not* be a helpful witness because his testimony would "put [Chatmon] right in the neighborhood at the time that the crime occurred." *Trial R. at 230.* This tactical decision was strongly supported by the prosecutor's stated reason for subpoenaing Chambers *as a witness for the State*: "The whole reason the State would like him to be here, is for the potential for *inculpatory* evidence against the Defendant." *Id. at 229 (emphasis added).* The police report also showed that Chambers had "warrants out of multiple departments," indicating that, if he had been called as a witness, his criminal history would have been used to impeach his testimony. *Doc. 31 at 28.*

Under these circumstances, it clearly was *objectively reasonable* for Chatmon's counsel to make the strategic decision that Chambers's testimony would hurt -- *not* help -- Chatmon. Furthermore, in light of the "substantial" evidence cited by the Arkansas Supreme Court in affirming Chatmon's convictions in his direct appeal, he has not demonstrated a reasonable probability that, had the jury heard

Chambers's testimony, the outcome of Chatmon's criminal proceeding would have been different.[8]

Accordingly, Chatmon's argument that his trial counsel was ineffective for failing to investigate Rodney Chambers and call him as a witness (Claim 3(a)), is without merit and should be denied.

### 3.   Prosecution's Alleged Suppression of Chambers's Statement (Claim 6(b))

Respondent argues that, in Chatmon's first *coram nobis* proceeding, the Arkansas Supreme Court reasonably adjudicated his claim that the prosecution suppressed Chambers's "exculpatory" statement.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment." *White v. Steele,* 853 F.3d 486, 490-91 (8th Cir.), *cert denied,* 138 S. Ct. 273 (2017). However, no *Brady* violation occurs where the evidence at issue is "equally accessible to the defense." *Liggins v. Burger*, 422 F.3d 642, 655 (8th Cir. 2005).

---

[8]*See Woods v. Norman,* 825 F.3d 390, 395-96 (8th Cir. 2016) (when applying *Strickland*'s prejudice analysis to a defense attorney's decision not to call a witness, a court should assess the credibility of all witnesses, the likely impeachment of the uncalled witness, the interplay of the uncalled witness and any defense witnesses, and the strength of the evidence presented by the prosecution), *cert. denied,* 137 S. Ct. 1075 (2017).

After allowing Chatman to raise this *Brady* claim in a *coram nobis* proceeding,[9] the Arkansas Supreme Court rejected the claim because the record made it clear "the defense was … aware" of the statement and its contents. This adjudication of the prosecutorial misconduct claim was not contrary to, or an unreasonable adjudication of *Brady*, nor was it based on an unreasonable determination of the facts in light of the state court record.  Accordingly, Chatmon's argument that the prosecution suppressed Chambers's statement (Claim 6(b)), is without merit and should be denied.

## C.   **Chatmon's Claim that His Trial Counsel was Ineffective Because She Failed to Challenge Admission of the Handgun Used in the Robbery (Claim 3(b))**

Chatmon argues that his trial attorney was ineffective for failing to move to suppress or otherwise challenge admission of the handgun that was found in the console of the SUV occupied by Chatmon when he was arrested. Chatmon argues that his fingerprints were not found on the gun, the victims could not identify it as the gun that was used in the robbery, and the prosecutor was allowed to "brandish" it in front of the jury, suggesting that it was the actual gun. *Doc. 2 at 6; Doc. 6 at 5; Doc. 31 at 12-13.*

---

[9]*See Chatmon ECN I,* 2015 Ark 417, at 5, 473 S.W.3d at 546 (citing *Barker, supra,* which cites *Brady*).

Respondent argues that the Arkansas Supreme Court reasonably adjudicated this claim in Chatmon's Rule 37 appeal, where it was explicitly rejected:

> Chatmon does not provide a basis upon which the gun could have been suppressed or excluded from evidence. The gun was seized in a legal search of the vehicle and was relevant to a determination of Chatmon's guilt. Ark. R. Evid. 401(b) (2015). A person seeking postconviction relief based on the failure of counsel to make an objection must show that the counsel could have made a successful objection in order to demonstrate prejudice. There is no such showing here.

*Chatmon Rule 37*, 2016 Ark. 126, at 6–7, 488 S.W.3d at 506 (citation omitted).

In his Petition for Rehearing before the Arkansas Supreme Court, Chatmon contended that the gun should have been suppressed because it was "inflammatory" and the evidence was insufficient to link it to the robbery. He also relied on a state crime lab report, dated August 30, 2012, which stated that the gun did not have any "latent prints containing sufficient unique characteristics to allow individualization to their source." *Doc. 21-16 at 5-6, 24.* The Court summarily denied Chatmon's Petition for Rehearing.[10]

---

[10]Section 2254(d)'s deferential standard applies even "when a state court's order denying relief is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington,* 562 U.S. at 98. In such cases, the habeas court must determine what arguments or theories "could have supported" the state court's decision and then ask "whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent" with the governing Supreme Court law. *Id.* at 102. In the context of an ineffective-assistance claim, the question is "whether there is any reasonable argument" that defense counsel met the *Strickland* standard for constitutionally effective assistance of counsel. *Id.* at 105.

In this § 2254 action, Chatmon has once again raised this claim, without identifying the *legal basis* that might have allowed his trial attorney to make a good faith objection and challenge the admissibility of the handgun into evidence.

According to the trial transcript, Officer Travis Caldwell testified that he found a "black semi-automatic handgun" in the SUV's console, and that the gun introduced into evidence was the "same handgun … that [he] located in the vehicle that day." *Trial R. at 446-50, 627*. Two of the victims testified that the gun used by the robber was black in color, and that it was a larger caliber semi-automatic handgun, about the size of a 9-millimeter or a .45. They both testified that the gun introduced at trial was "consistent" with the gun used in the robbery. *Id. at 363-64, 372, 384, 387*. In a recorded telephone conversation he made from the Faulkner County Detention Center ("FCDC"), Chatmon *admitted* that the gun found in the SUV's console belonged to him and he was angry with his girlfriend (Brown) for allowing the police to search the SUV. *Supp. Trial R. at 17-19, 24-25*. Finally, Monette Solomon testified that, while he was Chatmon's cellmate in the FCDC, he and Chatmon "spoke in depth" about the firearm used in the robbery and Chatmon told him that "he [Chatmon] might get off because the witness described it [the handgun] as a .45 and not a .40, that he actually had." *Trial R. at 492*.

On cross-examination, Chatmon's attorney elicited testimony from Officer Caldwell that there were "hundreds, maybe thousands" of guns in the city of Conway

that were similar to the gun found in the console of the SUV. Another officer admitted, on cross-examination, that "a lot of guns" fit the victims' descriptions of the gun used in the robbery, and the characteristics of the gun that police found in the console. *Id. at 432, 451.* Chatmon's attorney also elicited testimony from one of the victims, Derek Leidholm, that he could not say that the gun identified in court was "the gun that was used." *Id. at 375.*

Chatmon fails to explain how the fact the state crime lab report did not find his fingerprints on the gun could have provided a basis for pretrial suppression, especially since Chatmon *admitted* to Brown, in a recorded telephone conversation, that the gun found in the console of the getaway vehicle belonged to him. In short, nothing in the record or in Chatmon's arguments provides any legal basis for his trial counsel to have moved to exclude the gun from evidence. Finally, Chatmon's attorney's cross-examination of state witnesses adequately developed the few weaknesses available regarding the gun.

Thus, there was nothing "objectively unreasonable" about Chatmon's attorney not challenging the admission of the handgun into evidence. Furthermore, Chatmon has failed to establish a reasonable probability that any such challenge would have been successful or that the outcome of his criminal proceedings would have been different had such a challenge been made by his attorney. Thus, the Arkansas Supreme Court's adjudication of this ineffective-assistance claim was not an

unreasonable application of *Strickland,* nor was it based on an unreasonable determination of the facts in light of the state court record.

Accordingly, Chatmon's claim that his trial attorney was ineffective for failing to challenge the admissibility of the handgun (Claim 3(b)) is without merit, and should be denied.

## D.   Chatmon's Habeas Claims Related to Monette Solomon (Claims 3(c), 6(a) and 6(b))

All three of these claims stem from what Chatmon alleges was the "false" testimony of Monette Solomon, his cellmate in the FCDC and the State's purported "key witness." Solomon testified that, while Chatmon awaited trial on the aggravated robbery and theft of property charges, they were in the same "pod" in the FCDC. According to Solomon, Chatmon told him that: (1) he had "hit a lick" with a .40 caliber gun; (2) he "thought he might get off" because one of the victims described the gun as a .45 (not a .40) and the victims "thought he was in a Trial Blazer, when in all actuality he was in a Ford Explorer"; (3) Rodney Chambers was driving the vehicle but, after the robbery, they pulled off the road and switched seats so that Chatmon was driving, and Chatmon changed his shirt; and (4) they then "flew" to the gas station at Wal-Mart, so Chatmon could get on the security cameras and establish an alibi for the time of the robbery. *Trial R. at 490-96.*

Solomon also testified that: (1) he had prior felony convictions, and was currently awaiting sentencing for a federal firearms conviction, (*id. at 489)*; (2) no

"promises" had been made, by state or federal authorities, about what sentence he

would receive on the federal conviction if he testified against Chatmon in his state

court proceedings, (*id. at 489-90*); (3) he was "hopeful that [he] can possibly get

some time cut off [his] sentence, but nothing's promised or anything like that," (*id.*);

and (4) he understood "assisting the prosecuting attorneys" could be "taken into

consideration" in his federal sentencing, but a sentence reduction was "just a

possibility" and did not have to be granted by the federal sentencing court, (*id. at

494-95*).

On cross-examination, Solomon admitted that he and Chatmon had

"problems" in jail, including "an altercation" which led Solomon to ask to be

separated from Chatmon. *Id. at 497-98.* He also acknowledged that he had initiated

contact with the prosecutor's office about the information he had on Chatmon that

tied him to the pending armed robbery charges. *Id. at 498.*

In Chatmon's attorney's closing argument, she did a good job of explaining

the weaknesses in Solomon's trial testimony:

> So, we bring Monette Solomon in. Am I going to tell you he lied
> because he's a convicted felon, no. I think [the prosecutor] went over
> that in voir dire. I am one that believes that they could tell the truth. But
> remember he had had fights with Mr. Chatmon. Prior to the fact, Mr.
> Chatmon and him were friends. Gives him all this information
> according to Mr. Solomon. Then they have a fight. Guess what he does
> after the fight, contacts the prosecutor's office. Says, hey, I've got
> information for you. He may or may not get anything off his sentence.
> But that's what he's trying to do. He's coming here today in hopes that
> the U.S. Attorney is going to give him some time off his sentence. He

didn't like Mr. Chatmon. After they've had this conversation, they got in a fight at the jail. He didn't like him. So, we put all that together, I didn't like him and I might get some time off my sentence. I'll call the prosecutor's office. I'll tell them stuff. And if you notice the story was not quite the same. The story Mr. Solomon says that Mr. Chatmon told him was the shirt was changed at a different place. You know, they changed drivers in different places. I mean there's discrepancies in his story. Where do those discrepancies come from? Maybe he didn't know the whole story. Maybe he filled the story in. Maybe the story's nothing like that. You get to make that decision. As the Court gave you that information, you get to decide whether that witness is credible or not. You can use the fact that he has several convictions, or use the fact that he just didn't like Mr. Chatmon, so he made stuff up, added stuff to it in [hopes] that he'll get some time off his jail sentence.

*Id. at 540-42.*

In his Rule 37 Appeal Brief, Chatmon argued that his attorney was ineffective for failing to adequately impeach Solomon's credibility, but he provided no specifics, or any supporting facts. *Doc. 21-6 at 79*. The Arkansas Supreme Court held that Chatmon's claim failed, under *Strickland,* because it "lack[ed] factual substantiation." *Chatmon Rule 37*, 2016 Ark. 126, at 6, 488 S.W.3d at 505.

In Chatmon's Petition for Rehearing, he identified specific jail officials and inmates that his attorney allegedly should have called to impeach Solomon. *Doc. 21-16 at 6-7*. He attached four jail grievances/statements in which he and other inmates stated that they were being harassed and threatened by Solomon, as well as a jail inmate's statement that Solomon had offered him $100 to "fight [Chatmon] for him." *Id. at 25-29*. Without addressing Chatmon's jail documents, the Arkansas Supreme Court summarily denied the Petition for Rehearing.

In his first *coram nobis* proceeding, Chatmon expanded on his arguments related to Solomon's testimony, albeit in the form of a prosecutorial misconduct claim. He alleged that the State knowingly used "perjured testimony" from Solomon and "withheld" a transcript of Solomon's pretrial interview with law enforcement officers in violation of *Brady*.

In rejecting these arguments, the Arkansas Supreme Court held that: (1) Chatmon's attorney "was aware of, and utilized on cross-examination, information concerning [his] claim that he had altercations with Solomon"; (2) Chatmon had not alleged sufficient facts to "establish that the prosecution withheld material evidence with which the defense could have further impeached Solomon," or to demonstrate "a reasonable probability that, had [the interview] been disclosed to the defense, the result of the proceeding would have been different"; and (3) Chatmon had stated "no facts" to support his allegations that a transcript of Solomon's interview was prepared and suppressed, or that "the contents of the transcript would indicate that Solomon committed perjury and was coached by the prosecution." *Chatmon ECN I,* 2015 Ark. 417, at 6, 473 S.W.3d at 546. Finally, the Court noted Chatmon's claim regarding the prosecution's use of perjured testimony was not cognizable in a *coram nobis* proceeding because it was "the type [of claim] that could have been raised at trial." *Id.* at 7, 473 S.W.3d at 547.

In Chatmon's third *coram nobis* proceeding,[11] he again argued that the prosecution presented "false testimony" from Solomon and "withheld" the following information that could have been used to discredit him: (1) a partial Presentence Report ("PSR"), dated July 10, 2013, prepared by the United States Probation Office in anticipation of Solomon's federal sentencing; and (2) an April 2013 jail memo regarding the need for separating Solomon and Chatmon. *Doc. 82-1 at 12-24.* The PSR detailed Solomon's criminal history; the fact he was a fugitive from California; and his history of giving false information in return for favorable treatment. According to Chatmon, the PSR also showed that Solomon was untruthful in his testimony about the reduction in his federal sentence in exchange for his testimony against Chatmon.[12] Chatmon also resubmitted the jail grievances and statements that he had presented in his Rule 37 appeal. *Id. at 25-29.*

In again rejecting these prosecutorial misconduct claims, the Court stated the following:

> When we denied Chatmon's first coram nobis petition, it was noted that the defense was aware of, and utilized on cross-examination, information concerning Chatmon's claim that he had altercations with Solomon. Chatmon's allegations in the instant petition are equally insufficient to establish that the prosecution withheld material evidence about those conflicts with which the defense could have further impeached Solomon and produced a different outcome to this trial.

---

[11]Chatmon did not raise any claims about Solomon in his second *coram nobis* proceeding.

[12]The PSR stated that Solomon was facing a federal sentence of between 51 and 63 months on his federal conviction. Solomon testified he faced a maximum sentence of 30 months on the federal charge. *Doc. 82-1 at 22; Trial R. at 490.*

Thus, Chatmon has failed to demonstrate a reasonable probability that, had the defense presented the information [*i.e.*, the PSR, April 2013 jail memo, and jail grievances and statements] to the jury at trial, the result of the proceeding would have been different. He has offered no proof that the State knowingly utilized false testimony or otherwise suborned perjury, and we have held that a petitioner's allegation that a witness gave false testimony at trial, in and of itself, does not give rise to a showing of fundamental error that requires issuance of the writ. The writ of error coram nobis does not lie to correct an issue of fact that has been adjudicated or for alleged false testimony at trial.

To the extent that Chatmon's assertions concerning the allegedly false testimony could be considered claims that the evidence was insufficient to sustain the judgment, issues concerning the sufficiency of the evidence are issues to be settled at trial and on the record on direct appeal, not in a postconviction petition.

*Chatmon ECN III,* 2017 Ark. 229, at 4-5 (citations omitted). Finally, the Court observed that Chatmon's petition "borders on constituting an abuse of the writ" because even though Chatmon had "altered his assertions concerning Solomon, his allegation was essentially the same – that Solomon had reason to testify falsely." *Id.* at 5-6.

### 1.    Trial Counsel's Alleged Failure to Investigate, Obtain, and Use Evidence to Impeach Solomon (Claim 3(c))

In his habeas papers, Chatmon makes essentially the same ineffective assistance of counsel claims based on his trial attorney failing to investigate, obtain and use evidence to impeach Solomon. He argues that his attorney should have: (1) called jail officials and inmates to testify about Solomon's "constant harassment and

threats" toward him while they were incarcerated together; (2) pointed out that Solomon's version of events was inconsistent with the victims' testimony;[13] (3) provided him with the recording of the pretrial interview of Solomon so he could confirm counsel's assertion that it was "inaudible"; and (4) impeached Solomon about his history of harassing individuals, lying to police, prosecutors and judges, and using aliases and false names to elude authorities. In Chatmon's opinion, Solomon was a "highly impeachable" witness who "testified falsely" in hopes of a sentence reduction in his pending federal criminal case and "simply just to harass" Chatmon. *Doc. 2 at 6; Doc. 6 at 6; Doc. 31 at 7-8, 19; Doc. 89 at 1-3; Doc. 104.*

Chatmon repeatedly asserts that his convictions rested "solely" on Solomon's testimony, and characterizes the other evidence proving his guilt as "flimsy." In doing so, he *ignores* the "ample circumstantial evidence … that tied Chatmon to the crime," as outlined in great detail by the Arkansas Supreme Court in affirming his convictions on direct appeal. *Chatmon I,* 2015 Ark. 28, at 1-9; 467 S.W.3d at 733-37. Although the Court characterized Solomon's testimony as "crucial" direct evidence linking Chatmon to the crimes, the Court emphasized that, "[s]imply because the majority of the evidence was circumstantial does not mean that there was insufficient evidence supporting [Chatmon's] convictions." *Id.* at 9; 467 S.W.3d

---

[13]According to Chatmon, Solomon's testimony "put Chatmon going in the opposite direction" from the victims' testimony. *Doc. 6 at 6.*

at 737. Thus, Solomon's testimony about Chatmon's "jailhouse confession" was only one part of the strong and compelling evidence that supported his convictions.

Moreover, the trial transcript shows that Solomon's testimony *was impeached*: (1) he had prior felony convictions; (2) he was currently awaiting sentencing for a federal firearms conviction; (3) he was "hopeful" that he could get a "time cut" on the federal sentence if he testified against Chatmon in his state court proceedings; (4) he and Chatmon had "problems" and an "altercation" in jail; and (5) he had contacted the prosecutor's office with information about Chatmon's involvement in the armed robbery.

In her closing argument, Chatmon's attorney focused on Solomon's lack of credibility and emphasized that: he had several convictions; he and Chatmon had "fights" in jail; Solomon initiated contact with the prosecutor's office in an attempt to get some time off his federal sentence; he "didn't like" Chatmon; his "story" had discrepancies; and maybe "he made stuff up." *Trial R. at 540-42.* She did such a good job that, in his rebuttal argument, the prosecutor observed that she was "picking on poor Mr. Solomon." *Id. at 542.* The prosecutor even acknowledged that "absolutely the reason that [Solomon] is willing to testify against [Chatmon]" is "because [Solomon] hopes it helps him" on his federal sentence. *Id. at 535.* Thus, the issue of Solomon's credibility, and his motivation to testify against Chatmon, were squarely presented to the jury.

"[H]ow much to impeach a witness is generally a matter of trial strategy left to the discretion of counsel," and "even if [a defense attorney] was ineffective for not locating additional impeachment evidence and questioning [a witness] in all the [possible] ways," a habeas petitioner still must establish prejudice under *Strickland* by demonstrating a reasonable probability that the outcome of his criminal proceeding would have been different. *Dansby v. Hobbs,* 766 F.3d 809, 835 (8th Cir. 2014). Here, Chatmon's counsel effectively used the abundance of impeachment material in the record to discredit Solomon's testimony in her closing argument. Furthermore, the Arkansas Supreme Court explicitly *rejected* Chatmon's arguments regarding all of the same impeachment materials he now claims his trial attorney failed to use in cross-examining Solomon.

In his Rule 37 appeal, Chatmon challenged the effectiveness of his attorney in cross-examining Solomon and attached jail grievances and inmate statements supporting Solomon's threats and harassment of Chatmon while they were in the FCDC. The Arkansas Supreme Court rejected this ineffective assistance of counsel claim, which was completely undermined by: (1) his attorney's cross-examination of Solomon about his hostile relationship with Chatmon in the FCDC; (2) his attorney's closing argument, which emphasized Solomon's lack of credibility; and (3) the significant direct and circumstantial evidence that supported Chatmon's convictions. Thus, the Arkansas Supreme Court's decision was not an objectively

unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts.

This conclusion is reinforced by the Arkansas Supreme Court's later finding, in Chatmon's third *coram nobis* proceeding, that the jail grievances and inmate statements were not "material evidence" sufficient to demonstrate a "reasonable probability" that the outcome of Chatmon's trial would have been different had counsel used them to "further" impeach Solomon. The law is well established that the "materiality" standard under *Brady* is "the same as" the prejudice standard under *Strickland*. *Clay v. Bowersox,* 367 F.3d 993, 1000 (8th Cir. 2004) (evidence is "material" under *Brady* if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

Chatmon also argues that his attorney was ineffective for failing to obtain and use Solomon's pretrial interview with state authorities to impeach him.[14] According to Chatmon's trial counsel, the recording of Solomon's pretrial interview was "inaudible." However, even if it was audible, Chatmon's *entirely speculative assertion* that the contents of that recording would have established that Solomon "testified falsely" is *not* sufficient to overcome *Strickland*'s presumption that his

---

[14]This argument is completely at odds with Chatmon's *Brady* claim that the prosecutor hid and "withheld" the interview from his trial attorney.

attorney rendered adequate assistance.[15] No one disputes that Solomon was interviewed by state authorities and that, during his interview, he provided information that led the Faulkner County prosecutor to call him as a witness in Chatmon's trial. However, other than Chatmon's speculation about the content of that interview, which his attorney reported to be "*inaudible*," Chatmon has not come forward with any evidence sufficient to demonstrate that anything in that interview was inconsistent with Solomon's trial testimony or that it would have altered the outcome of his trial.

Finally, Chatmon argues that his trial attorney was ineffective for failing to use the federal PSR and its contents to impeach Solomon. Chatmon appears to have obtained the partial PSR on January 5, 2017, by submitting a FOIA request to the Arkansas Public Defender Commission, which located the partial PSR *in his trial counsel's file*. *See Doc. 60 at 4-5.* The PSR is dated July 10, 2013, about one month before Chatmon's trial. Thus, Chatmon's attorney was aware of the PSR and its contents at the time of trial, but made the tactical decision not to use it to impeach Solomon. In light of the other strong impeachment material available to her in cross-examining Solomon, nothing about that decision appears to be objectively

---

[15]*See Burt*, 134 S. Ct. at 17 ("It should go without saying that the absence of evidence cannot overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.").

unreasonable. However, even if it were, Chatmon has failed to establish that he suffered prejudice under the *Strickland* standard.[16]

In his third *coram nobis* proceeding, the Arkansas Supreme Court expressly held that the federal PSR was not "material evidence" sufficient to "demonstrate a reasonable probability that, had the defense presented the information to the jury at trial, the result of the proceeding would have been different." *Chatmon ECN III,* 2017 Ark. 229, at 4-5. Similarly, even if Chatmon's attorney had obtained and used the PSR to cross-examine Solomon about his past criminal conduct, Chatmon has not established a reasonable probability that the outcome of his trial would have been different, in light of the other impeachment evidence already in the record and the significant evidence of guilt otherwise supporting Chatmon's convictions. The jury was made aware that Solomon was a convicted felon and that his testimony against Chatmon was motivated by his "hope" for a reduction in his federal sentence. There was no "undisclosed deal": Solomon testified candidly in this regard, and the prosecutor acknowledged that the potential sentence reduction was "absolutely the reason" for Solomon's testimony. Chatmon's attorney forcefully argued Solomon's credibility to the jury, as well as his motivation to "make stuff up" because he disliked Chatmon and hoped for a sentence reduction.

---

[16]"If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," without addressing the deficient-performance prong, "that course should be followed." *Strickland*, 466 U.S. at 697.

Accordingly, Chatmon has failed to establish that any aspect of his trial counsel's performance, in dealing with Solomon and his testimony, was objectively unreasonable, or that, if she had presented additional impeachment evidence, there is a reasonable probability that the outcome of Chatmon's criminal proceedings would have been different. *Strickland,* 466 U.S. at 687-88, 694.

Thus, Chatmon's claim that his trial counsel was constitutionally ineffective, for failing to investigate, obtain and use evidence to impeach Solomon (Claim 3(c)), is without merit and should be dismissed.

## 2. Prosecutor's Alleged Use of Perjured Testimony from Solomon (Claim 6(a))

Chatmon argues that the State knowingly presented "false testimony" from Solomon at trial. He alleges that Solomon's pretrial recorded interview, which was in the possession of the prosecution, is "believed to show" that Solomon committed perjury. *Doc. 2 at 10; Doc. 6 at 11; Doc. 31 at 19-20.*

Although Chatmon raised this prosecutorial misconduct claim in his first and third *coram nobis* proceedings, the Arkansas Supreme Court held it was "not cognizable" and that issues concerning "allegedly false testimony" are "to be settled at trial and on the record on direct appeal." *Chatmon ECN I,* 2015 Ark. 417, at 7, 473 S.W.3d at 547; *Chatmon ECN III,* 2017 Ark. 229, at 4-5.

As "cause" to excuse his default, Chatmon appears to blame his trial attorney for failing to preserve this claim so that it could have been raised on direct appeal.

However, because Chatmon has failed to demonstrate that any such ineffective-assistance claim would be meritorious under *Strickland*, it cannot constitute cause.[17] As the Court noted in his *coram nobis* proceedings, Chatmon presented "no proof" that the State knowingly utilized false testimony from Solomon. Similarly, in Chatmon's habeas papers, he has presented *no evidence* that the prosecution *knowingly* used false testimony from Solomon. Accordingly, Chatmon's claim that the prosecution knowingly used perjured testimony from Solomon (Claim 6(a)), should be dismissed as procedurally defaulted.

### 3. Prosecutor's Alleged Withholding of Impeachment Evidence Related to Solomon (Claim 6(b))

Chatmon raises a *Brady* violation based on the prosecution allegedly "withholding" from him: (1) Solomon's recorded interview, which he alleges could have been used to show that he testified "falsely"; and (2) the PSR prepared in Solomon's federal case, which contained impeachment evidence about his criminal history, use of aliases, and an "undisclosed deal" in exchange for his testimony against Chatmon. *Id.; Doc. 84 at 5.*

Respondent argues that, in Chatmon's first and third *coram nobis* proceedings, the Arkansas Supreme Court reasonably adjudicated his claims that the

---

[17]*See Murray v. Carrier,* 477 U.S. 478, 488, 492 (1986) (ineffective assistance of trial or appellate counsel constitutes "cause" to lift a procedural bar only if the attorney's performance was constitutionally deficient under *Strickland*); *Clemons v. Luebbers,* 381 F.3d 744, 752 (8th Cir. 2004).

prosecution "withheld" or "suppressed" Solomon's recorded interview and the federal PSR. The Court agrees.

Nothing about the Arkansas Supreme Court's rejection of Chatmon's *Brady* claim was contrary to, or an unreasonable application of *Brady* and its progeny. Similarly, the Arkansas Supreme Court's decision was not based on an unreasonable determination of the facts in light of the state court record. As previously discussed, Chatmon presented only conclusory and factually unsupported allegations in state court to support his claim that Solomon's pretrial interview with state law enforcement officers would have shown that he committed perjury in his testimony at Chatmon's trial, and that he was "coached" by the prosecution. A petitioner cannot establish a *Brady* violation when he "can only speculate that the [suppressed evidence] might have contained material exculpatory information." *United States v. Rouse,* 410 F.3d 1005, 1010 (8th Cir. 2005). Chatmon's entire argument about the alleged contents of Solomon's pretrial interview (which was recorded in a way that made it "inaudible") is based solely on speculation and falls far short of the showing required to create a reasonable probability that, had the content of the interview been disclosed to his trial counsel, the result of his trial would have been different.

Thus, the Arkansas Supreme Court's rejection of Chatmon's *Brady* claim, regarding the alleged "suppression" of Solomon's PSR, was not contrary to, or an unreasonable application of federal case law, nor was it based on an unreasonable

determination of the facts in light of the state court record. As previously discussed, Chatmon ultimately obtained the PSR from *his trial counsel's file*, and he asserts that she had the PSR "at her disposal" *before* his trial. *Doc. 89 at 1.* There can be no *Brady* violation if Chatmon's counsel had the PSR.[18]

Finally, even if the PSR was not made available to Chatmon's counsel prior to trial, the Arkansas Supreme Court reasonably determined, in light of the other impeachment evidence in the record and the strength of the State's other evidence of Chatmon's guilt, that he had failed to demonstrate a reasonable probability that, had his defense counsel utilized the contents of the PSR to "further" impeach Solomon, the outcome of the trial would have been different.

Accordingly, Chatmon's claim that the prosecutor allegedly withheld materials that could have been used to impeach Solomon (Claim 6(b)), is without merit and should be dismissed.

## E.   **Chatmon's Claim that Trial Counsel Failed to Adequately Cross-Examine Other State Witnesses (Claim 3(d))**

Chatmon argues that his trial attorney was ineffective for failing to adequately cross-examine certain State witnesses about their prior inconsistent statements.

---

[18]In some of his habeas papers, Chatmon tries to have it both ways by claiming that the PSR was "withheld" from his attorney until after his trial. His only support for this assertion arises from the fact she did not cross-examine Solomon about any matters in the PSR. *Doc. 80 at 3; Doc. 83 at 2-3.* Obviously, her not using the PSR to cross-examine Solomon in no way means she did not have that document.

Specifically, he argues that Crystal Brown's trial testimony was inconsistent with her prior statement regarding whether Chatmon exited from the passenger side or from the driver side of the vehicle. He also argues, generally, that counsel's cross-examination of other adverse witnesses allowed them to "reiterate the State's evidence and version of events." *Doc. 2 at 6; Doc. 6 at 4-5; Doc. 31 at 8-9.* Finally, Chatmon argues that his attorney failed to exploit discrepancies in the testimony and statements of witnesses about the descriptions of the robber and the getaway vehicle.[19] *Doc. 31 at 2-3.*

Respondent contends that the Arkansas Supreme Court reasonably adjudicated this ineffective assistance of counsel claim in Chatmon's Rule 37 appeal, where he mentioned problems related to the testimony of several witnesses (including Brown and the victims) but did *not* describe the factual inconsistencies and weaknesses that his counsel allegedly failed to bring out on cross-examination. *Doc. 21-6 at 76-79.* Respondent correctly notes that the Arkansas Supreme Court explicitly rejected this "conclusory" claim because it "lack[ed] factual substantiation" as required by *Strickland. Chatmon Rule 37*, 2016 Ark. 126, at 6, 488 S.W.3d at 505.

---

[19]According to Chatmon, the general physical description given by the victims – an African-American male in a white shirt, dark jeans, baseball hat and basketball shoes – "identifies hundreds of potential suspects." *See Doc. 6 at 1; Doc. 31 at 2-3.*

In his habeas papers, Chatmon makes the same argument, but emphasizes specific alleged inconsistencies in the testimony of Brown and the victims. Even with the added specificity about his trial counsel's alleged failure to exploit these inconsistencies, his claim falls far short of satisfying the *Strickland* standard for establishing an ineffective assistance of counsel claim.

According to the trial transcript, Derek Leidholm (one of the victims) testified that, after the robbery, he saw Chatmon running beside a dark SUV, that later sped away. *Trial R. at 374-77.* Brown (Chatmon's girlfriend) testified that, shortly after the robbery, she saw Chatmon arrive in the parking lot of her apartment complex, get out of the passenger's side of her dark SUV, walk toward the dumpster where one victim's wallet was later discovered, and then return to the SUV and get in the driver's seat. *Id. at 460-61.* Two police officers testified that, when they arrested Chatmon in the parking lot, he was in the driver's seat of a dark SUV. *Id. at 414-15, 443.*

Chatmon's attorney did not cross-examine Brown about the inconsistencies in her prior statements because those inconsistencies were inconsequential.[20]

---

[20]When the police initially questioned Brown the night of Chatmon's arrest, she gave a statement in which she said she saw Chatmon exit the passenger's side of the SUV when he arrived in the parking lot. *Doc. 31 at 28.* Three days later, police questioned her again. She said  Chatmon exited from the driver's side of the SUV, but went on to state, two times, that he exited the passenger's side, walked in the direction of the dumpster, then got back in the SUV on the driver's side. *Id. at 33.* Thus, her trial testimony -- that he exited the passenger's side and got back in on the driver's side – was consistent with three prior statements and inconsistent with one. No

Moreover, pointing out the minor inconsistency in Brown's testimony might well have harmed Chatmon's defense. Brown's prior statement, that Chatmon exited from the driver's side of the SUV, would have *supported* Monette Solomon's testimony that Chatmon told him Chambers was initially driving but, after the robbery, they pulled off the road and switched seats so that Chatmon was in the driver's seat. *Id. at 493, 495-96.* As it stood, Brown's trial testimony conflicted with Solomon's, something that called into question the credibility of both witnesses.

Shortly after Chatmon was arrested, the police brought the victims to the scene of the arrest, where all three victims identified Chatmon as the man who had robbed them at gunpoint. *Id. at 151-54, 171-74, 188-90, 200-03.* Chatmon's attorney was later *successful* in getting the trial court to suppress all testimony from the victims about their identification of Chatmon at the scene of his arrest. *Id. at 35-36, 40, 78, 145-213.* This limited the trial testimony of Derek Leidholm and the other victims to their description of the robber given to authorities the night of the crime, and to their recollections of the robber's appearance. Chatmon's attorney cross-examined all three victims, questioning them about: their descriptions of the robber's physical

---

reasonably competent attorney would waste time and personal credibility trying to "exploit" such a trivial matter.

appearance and clothing; their descriptions of the vehicle; their proximity to the robber; and inconsistencies in their statements.[21] *Id. at 374-77, 391-95, 403-05.*

Chatmon's attorney moved for a directed verdict on the ground that the evidence presented was not sufficient to establish that Chatmon was "the person that committed the [crimes]." She argued that no witness could identify Chatmon and that there were discrepancies in the victims' testimony. *Id. at 499-502.* In her closing argument, she pointed out that: none of the victims identified Chatmon as "the man that did it"; each victim gave "a little different description" of the robber and the vehicle; and their descriptions would fit many individuals and vehicles. She also argued that the State had not proven, beyond a reasonable doubt, that "Mr. Chatmon is the person that committed that crime." *Id. at 537-40, 542.* In light of this performance, it is hard to imagine what further steps she could have taken to challenge the victims' testimony.

Finally, in Chatmon's direct appeal, the Arkansas Supreme Court rejected his sufficiency-of-the-evidence argument, which focused on the weakness of the victims' testimony and their inability to identify him as the robber. *Doc. 21-2 at 6-13.* The Court held that "ample circumstantial evidence … tied Chatmon to the

---

[21]For example, Chatmon's attorney elicited testimony from Derek Leidholm that: (1) he "couldn't see [the robber's] face"; (2) he could not say the vehicle in the police photos was "the vehicle," or the gun identified at trial was "the gun"; and (3) he never saw the robber get into a vehicle, and only saw him from the back when he was running away. *Id. at 374-77.*

crimes," and "direct evidence link[ed] him to the crimes," including his own admission to Solomon that he committed those crimes. *Chatmon I,* 2015 Ark. 28, at 1-2, 4-10, 467 S.W.3d at 733-37.

Thus, the Court concludes that Chatmon has failed to establish that his trial attorney's performance was objectively unreasonable, or that, if his attorney had cross-examined Brown and the victims differently, there is a reasonable probability that the outcome of Chatmon's criminal proceedings would have been different. Accordingly, Chatmon's claim that his attorney failed to adequately cross-examine state witnesses (Claim 3(d)), is without merit and should be dismissed.

## F.   Chatmon's Habeas Claims Related to Tiffany Fisk's Sentencing Phase Testimony About "Other Crimes" (Claims 2, 3(e) and 6(c))

During the sentencing phase of Chatmon's trial, Fisk testified that, on May 3, 2012, an armed intruder robbed and attempted to rape her in her home.[22] She identified Chatmon as her assailant. *Trial R. at 569-72.* On cross-examination, Chatmon's attorney had "no questions" for Fisk. *Id. at 573.* When Chatmon "objected" and asked to testify, his attorney called him to the stand. He testified that Fisk had "falsely identified" him and that the crime lab had found he "wasn't a

---

[22]At the time of Chatmon's trial, criminal charges were pending against him for the armed robbery and attempted rape of Fisk. *State v. Chatmon,* Faulkner Co. Cir. Ct. No. CR 2012-572 (electronically accessed at https://caseinfo.aoc.arkansas.gov). Those charges were dismissed on June 29, 2015, almost two years after Chatmon was sentenced, as a habitual offender, to consecutive life imprisonment terms on the instant aggravated robbery convictions.

person that contributed to the DNA mixtures of the evidence [that had been] obtained." *Id. at 573-74.*

Before Fisk testified, the State had introduced evidence that Chatmon had three prior felony convictions and was classified as a habitual offender, which subjected him to a sentence of up to life in prison. *Id. at 564-65, 631-51.* The State also introduced evidence that Chatmon had an extensive disciplinary history while previously incarcerated in the ADC. *Id. at 565, 583-85, 640-51.*

Finally, the prosecutor called a sheriff's deputy, who was serving as a bailiff during Chatmon's trial and sentencing. The bailiff testified that, while Chatmon was being escorted from a holding cell earlier in the trial, he "bolted" and ran out of the courthouse. The bailiff was able to apprehend Chatmon about a block away. *Id. at 551-52, 565-67.*

In his Rule 37 Appeal Brief, Chatmon argued that the trial court erred in admitting Fisk's testimony, and that his attorney was ineffective for failing to challenge her testimony. *Doc. 21-6 at 71-72, 83-84.* The Arkansas Supreme Court held that the claim of trial court error was "not grounds for relief under Rule 37.1" because it "could have been addressed at trial and on the record on direct appeal." *Chatmon Rule 37,* 2016 Ark. 126, at 3, 488 S.W.3d at 504.

The Court rejected the ineffective assistance of trial counsel claim because Chatmon did not "explain how the testimony of Tiffany Fisk, which he contends was

41

improper, could have been successfully excluded," or "describe the nature of [the] alleged exculpatory evidence and … how it could have discredited [Fisk's] testimony." *Id.* at 7, 488 S.W.3d at 506.

In his Petition for Rehearing, Chatmon referred to a state crime lab report, dated September 4, 2012, showing that Chatmon was "excluded as a contributor to the DNA mixtures obtained" in the Fisk case. *Doc. 21-16 at 13.* He also relied on a May 23, 2013 letter from his trial attorney, which stated that the semen on a towel was from Fisk's boyfriend, and a hair on the towel was "inconsistent" with Chatmon's hair. *Id. at 11-12.* Without addressing the crime lab report or the letter from Chatmon's attorney in the Fisk case, the Arkansas Supreme Court summarily denied Chatmon's Petition for Rehearing.

### 1.   Alleged Trial Court Error in Admitting Fisk's Testimony About Chatmon's "Other Crimes" (Claim 2)

Chatmon argues that the trial court violated his federal constitutional rights in allowing Fisk to testify, in the sentencing phase of his trial, that he robbed and attempted to rape her in her home. Specifically, he claims that, because those criminal charges were dismissed several years *after* he was sentenced and the DNA evidence in Fisk's case "exonerated" him, her testimony in the sentencing phase of his trial violated his constitutional rights. *Doc. 2 at 5; Doc. 6 at 2-3; Doc. 31 at 5.*

Respondent argues that this alleged federal constitutional claim is procedurally barred because Chatmon raised it, *for the first time*, in his Rule 37 post-

conviction proceedings, instead of doing so during his trial and on direct appeal. The Court agrees.

As "cause" to excuse his procedural default, Chatmon blames his trial counsel and the attorney who handled his direct appeal. As will be discussed, this ineffective assistance of counsel claim is wholly without merit because there was no plausible or good faith basis for his trial or appellate counsel to challenge the admissibility of this testimony during the sentencing phase of his trial. Accordingly, because there was no "ineffectiveness" by his trial or appellate counsel, it cannot provide a basis for excusing Chatmon's procedural default of that claim.

### 2. Chatmon's Trial Counsel's Alleged Failure to Challenge "Other Crimes" Evidence During the Sentencing Phase of His Trial (Claim 3(e))

Chatmon argues that his attorney was ineffective for failing to object to Fisk's testimony, cross-examine her, or present the exculpatory DNA evidence to rebut her testimony. He alleges that his attorney was aware of the DNA evidence because she had been appointed to represent him in both the Fisk case and the case at issue here. *Doc. 2 at 6; Doc. 6 at 2-3; Doc. 31 at 5, 7, 12; Doc. 89 at 3; Doc. 104 at 3.*

Under Arkansas law, "relevant character evidence … considered inadmissible during the guilt phase of a criminal trial may be admissible during the sentencing phase." *Huff v. State,* 2012 Ark. 388, at 7-8, 423 S.W.3d 608, 612. This includes evidence of uncharged criminal conduct, or charges of which the defendant is later

acquitted. *Id.* (upholding admission of sentencing phase testimony about a similar instance of the defendant's breaking into a nearby home); *McElroy v. State,* 2011 Ark. App. 533, at 8, 385 S.W.3d 406, 410 (upholding admission of another sexual assault even though defendant was later acquitted of the charge).

There is no dispute that, at the time Chatmon was convicted and sentenced on the three counts of aggravated robbery and one count of theft of property giving rise to this habeas action, he had charges pending against him for robbing and attempting to rape Fisk in Faulkner County Case No. CR 2012-572. His attack on Fisk occurred about two weeks *before* the aggravated robberies of the Leidholms and McGuire, in the same area of the city.

The Order of Nolle Prosequi in Case No. CR 2012-572, which was the basis for dismissing the charges that Chatmon robbed and attempted to rape Fisk, *explicitly stated* that the prosecution had elected not to pursue the robbery and attempted rape charges because of the life sentences Chatmon received in the instant case, and because he "presents a danger when he is transferred to the county jail." Thus, contrary to Chatmon's assertion, those charges were *not* dismissed because of insufficient evidence.

As a matter of trial strategy, Chatmon's attorney made a wise decision in *not* asking Fisk any questions on cross-examination. Instead, she called Chatmon as a witness and he testified that Fisk had "falsely identified" him and that the crime lab

had found that he "wasn't a person that contributed to the DNA mixtures of the evidence [that had been] obtained." *Trial R. at 573-74.* Apparently, Chatmon believes that, because Fisk's boyfriend's semen – not Chatmon's – was found on a towel outside Fisk's home, this somehow was evidence that "exonerated" him of the crimes of robbing and *attempting* to rape Fisk. In making this argument, Chatmon *ignores* the fact that Fisk identified him, in the courtroom, as the man who had robbed and attempted to rape her in her home. Suffice it to say, the DNA evidence on the towel *in no way* "exonerated" Chatmon as the perpetrator of the robbery and attempted rape of Fisk.

Chatmon's trial attorney was fully aware of the DNA evidence from the towel and, in her May 23, 2013 letter to Chatmon, she *correctly* noted that the DNA lab report was *not* "helpful" to his defense against Fisk's charges and that it could be "harmful" to his defense because it tied the towel to Fisk's home, which would corroborate another witness's expected testimony that Chatmon had used a towel to clean the doorknobs and other surfaces as he left Fisk's home. Thus, it was not objectively unreasonable for Chatmon's trial attorney to decline, as a matter of strategy, to use the state crime lab DNA report, which was of *no value* in trying to impeach Fisk's eyewitness testimony identifying Chatmon as the person who robbed and attempted to rape her.

Finally, Fisk's testimony was not the only evidence introduced during the sentencing phase of Chatmon's trial. The prosecution also introduced evidence of Chatmon's multiple prior felony convictions; his status as a habitual offender; his extensive ADC disciplinary history; and his attempted escape from the courthouse while the jury was deliberating his guilt.[23] Based on this record, Chatmon has failed to establish a reasonable probability that, if his trial attorney had cross-examined Fisk, the outcome of Chatmon's sentencing would have been different.

Thus, the Court concludes that the Arkansas Supreme Court's adjudication of Chatmon's ineffective assistance of counsel claim, based on his attorney's failure to cross-examine Fisk, was not an unreasonable application of *Strickland,* nor was it based on an unreasonable determination of the facts. Accordingly, this habeas claim (Claim 3(e)) is without merit and should be dismissed.

### 3. Prosecution's Alleged "Misrepresentation" of Fisk's Testimony During the Sentencing Phase of Chatmon's Trial (Claim 6(c))

Finally, Chatmon argues that prosecutorial misconduct occurred because the prosecutor "misrepresented" the evidence presented through Fisk's testimony. He argues that he had not been found guilty of the conduct alleged by Fisk and the

---

[23]The jury also witnessed Chatmon's repeated interruptions during the sentencing proceeding, which prompted the trial court to tell him to "be quiet, or you'll be removed." *See Trial R. at 573* ("They keep coercing people."), *575* (Well, f--- it, man. … Railroading. … Y'all sure do talk. … I'm not a part of this commodity y'all got going on."), *582* ("I don't want to be here."), *585-86* ("What the crime lab say, tell them that.").

prosecution was in possession of the DNA evidence that "excluded" him. *Doc. 31 at 19.*

Respondent argues that this prosecutorial misconduct claim is procedurally barred because Chatmon presented it for the first time in his *coram nobis* proceedings. In denying Chatmon *coram nobis* relief, the Arkansas Supreme Court held it could not consider his prosecutorial misconduct claim because it was "the type [of claim] that could have been raised at trial or in some other legal proceeding." *Chatmon ECN I,* 2015 Ark. 417, at 7, 473 S.W.3d at 547.

As "cause" to excuse his procedural default of this claim, Chatmon once again blames his trial and direct-appeal attorneys. There are *no facts* in the record to support Chatmon's claim that the prosecution "misrepresented" Fisk's testimony, which clearly was admissible in the sentencing phase of Chatmon's trial. Because there was no plausible or good faith basis for Chatmon's trial or appellate counsel to challenge the prosecution's *nonexistent* "misrepresentation," the failure to object cannot provide a legal basis for excusing Chatmon's procedural default of that claim. Thus, this habeas claim (Claim 6(c)) should be dismissed as procedurally defaulted.

## G.    <u>Chatmon's Claims That the Trial Court Erred in Failing to Appoint New, "Conflict-Free" Counsel (Claims 3(f) and 5)</u>

Chatmon's trial attorney was appointed at his arraignment on May 18, 2012. *Trial R. at 1, 13.* Four days later, on May 22, 2012, she filed a demand for speedy trial and a motion for discovery. *Id. at 15-18.* Shortly thereafter, she received the

prosecutor's file, followed by further supplemental disclosures. *Id. at 20-21, 23-24, 39, 41.*

On October 10, 2012, Chatmon filed a *pro se* motion for appointment of new counsel, alleging that his attorney had only "briefly spoken" with him, had made "no attempt" to investigate his case, refused to respond to his letters, and refused to file certain motions he had requested. *Id. at 29.* According to Chatmon, his attorney told him no other attorney would be appointed to represent him. *Id. at 32.* In December 2012, he wrote letters to the Arkansas Public Defender Commission requesting appointment of new counsel. *Doc. 21-5 at 56-60.*

On January 4, 2013, Chatmon's attorney filed a motion to suppress the victims' "show-up" identifications. *Trial R. at 35-36.* After holding a lengthy hearing, on April 4, 2013, the trial court granted the motion, holding that "no testimony will be allowed as to the 'show up' or its results." *Id. at 40, 78, 145-213.* At that hearing, Chatmon made no complaints about his attorney or her representation.

On April 26, 2013, Chatmon's attorney obtained a 40-year plea offer on the charges that are the subject of this habeas action *and* the other charges pending against Chatmon based on his alleged robbery and attempted rape of Fisk. *Doc. 21-5 at 61-62.* Chatmon *declined* the plea offer.

48

On July 8, 2013, the trial court held a hearing on the State's motion to continue the trial date because a state witness was unavailable on the day the case was then scheduled to be tried. The trial court granted the State's motion and rescheduled the case for trial on August 8-9, 2013. *Trial R. at 62-63.* According to Chatmon, during that hearing, he made a *pro se* motion to dismiss his case. The trial judge instructed Chatmon to "have his attorney file the motion." Chatmon responded that his attorney "refused to do anything that he asked her to do." Chatmon alleges the trial judge told him that, if he wanted to file *pro se* motions, he would have to represent himself.[24] *Docs. 53, 58 & 59.*

On August 5, 2013, three days before trial, the court granted a joint motion to sever a felon-in-possession charge; thereby preventing the State from introducing evidence in the guilt phase about Chatmon's prior criminal convictions. *Trial R. at 80, 596.* At some point before the trial date, Chatmon's attorney obtained a 25-year plea offer from the prosecution, which Chatmon *declined*. *Id. at 218-19.*

On the first day of trial, Chatmon confirmed, on the record, that he was declining all plea offers. *Id. at 219-21.* Chatmon's attorney then brought up several other matters on his behalf, including his request for a dismissal due to a perceived speedy trial violation; his desire to testify; his request for a continuance to locate Rodney Chambers; and his request for a change of venue. *Id. at 221-24, 226-32.*

---

[24]The hearing on July 8, 2013 was not transcribed and is not part of the record.

Chatmon was allowed to personally address the court two times. First, he stated that he felt the evidence was not sufficient and suggested that he was being "railroaded." *Id. at 224-25.* Later, he was allowed to explain why he thought Chambers was a necessary witness. *Id. at 229-30.*

During the guilt phase of Chatmon's trial, his attorney cross-examined every state witness, and moved for a directed verdict at the close of the State's case on the basis of lack of identification. *Id. at 499-502.* After the trial court denied the motion, Chatmon was again allowed to personally address the court and present additional *pro se* arguments for dismissal. *Id. at 504, 506-09.*

After consulting with Chatmon, his attorney informed the court that he would not be testifying and that the defense had no witnesses. She renewed her directed-verdict motion, which the trial court denied. *Id. at 510-11.* She presented various legal arguments regarding jury instructions. *Id. at 511-14.* In her closing argument, she forcefully argued weaknesses in the State's case concerning the identification of the perpetrator, witness credibility, and "reasonable doubt." *Id. at 537-42.*

During the sentencing phase of his trial, Chatmon took the stand and testified that: (1) the State had "coerced" all the witnesses; the evidence was "one-sided" and was "not adding up"; (2) Fisk had "falsely identified" him as the person who robbed and attempted to rape her; and (3) his attorney had not been "representing [him] properly." *Id. at 573-74.*

After his conviction, Chatmon filed a *pro se* motion for new trial, arguing that the evidence was insufficient; he did not receive a fair trial; and his attorney had failed to properly cross-examine witnesses. *Id. at 103*. On September 10, 2013, the trial court held a hearing on the motion. *Id. at 593-603*. Chatmon testified, raising various complaints about his trial, including his attorney's performance. *Id. at 597-98.* In addressing Chatmon's allegations, the prosecutor characterized the performance of Chatmon's attorney as "exemplary" and "more than adequate," particularly in light of the "overwhelming" evidence against him. *Id. at 596-97.* After hearing arguments from both parties, the trial court stated, on the record, that Chatmon's "proof falls woefully short" of proving ineffective assistance of counsel. *Id. at 601.* On October 2, 2013, the trial court entered a written order denying the motion for new trial and finding no merit to any of Chatmon's claims. *Id. at 130-31.*

In his Rule 37 petition, Chatmon argued that the trial court erred in refusing to appoint new counsel, and that his trial attorney was ineffective based on a "conflict of interest." *Doc. 21-5 at 77-78, 81-83.* After the trial court denied Rule 37 relief, Chatmon appealed.

The Arkansas Supreme Court, in affirming the denial of Rule 37 relief, noted that it could not address the trial court's decision not to appoint new counsel for Chatmon because that issue had not been ruled on by the trial court:

> Where the trial court provides written findings on at least one, but less than all of the petitioner's claims, we have held that an appellant has an

51

obligation to obtain a ruling on any omitted issues if they are to be considered on appeal. Chatmon's failure to obtain a ruling on this claim precludes review by this court.

*Chatmon Rule 37,* 2016 Ark. 126, at 7-8, 488 S.W.3d at 506 (citation omitted).

The Court then rejected Chatmon's claim that his attorney's "poor performance was the result of a conflict of interest":

> An actual conflict of interest generally requires proof that counsel "actively represented conflicting interest[s]" of third parties. *Townsend v. State,* 350 Ark. 129, 134, 85 S.W.3d 526, 528 (2002). There is no evidence in the record of an actual conflict. In the absence of an actual conflict, a petitioner alleging that counsel's performance was deficient due to another form of conflict must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* (citing *Mickens v. Taylor,* 535 U.S. 162 (2002)). Chatmon's bare assertion that his relationship with counsel was tainted by hostility and that he desired other representation does not, standing alone, establish that he was deprived of effective representation.

*Id.* at 5, 488 S.W.3d at 505. As discussed, the Court went on to reject, under the *Strickland* standard, Chatmon's specific claims that his trial attorney was ineffective.

1.   **Trial Counsel's Alleged Constitutional "Ineffectiveness" Arising from Her Failure to Remove Herself from the Case Due to Conflicts of Interest (Claim 3(f))**

Chatmon argues that his trial attorney was constitutionally ineffective for not removing herself from his case due to "conflicts of interest" arising from: (1) him complaining about her to the trial court and the Arkansas Public Defender Commission; and (2) him filing a *pro se* pretrial motion requesting appointment of new counsel. *Doc. 2 at 6; Doc. 6 at 3-4; Doc. 31 at 6-7; Doc. 89 at 3-4.*

Respondent argues that, because the Arkansas Supreme Court reasonably adjudicated this claim in Chatmon's Rule 37 appeal, it does not provide the requisite legal basis for obtaining federal habeas relief. *Chatmon Rule 37,* 2016 Ark. 126, at 5, 488 S.W.3d at 505. The Court agrees.

The Sixth Amendment right to counsel encompasses "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). It does not, however, guarantee the right to a "'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983). A personality conflict, or disagreements regarding trial strategy, has been held not to amount to an unconstitutional conflict of interest. *Owsley v. Bowersox*, 234 F.3d 1055, 1057 (8th Cir. 2000) (denying federal habeas relief because "there is no Supreme Court precedent holding that controls the issue of Mr. Owsley's complaint" that he had "personality conflicts" with his trial attorney); *see also United States v. Rodriguez*, 612 F.3d 1049, 1055 (8th Cir. 2010) (the right to counsel is not violated by general dissatisfaction or disagreements over strategy because there is no "right to an attorney 'who will docilely do as she is told' … or advance meritless legal theories") (quotation omitted). Similarly, an attorney is not required to affirmatively remove herself from a case when her client complains about her performance. *See Winfield v. Roper,* 460 F.3d 1026, 1040 (8th Cir. 2006) (a defendant cannot

"manufacture" a conflict of interest by initiating lawsuits or filing complaints against his attorney).

Where, as here, an alleged conflict of interest involves issues other than "multiple or serial representation," a habeas petitioner must satisfy the two-part *Strickland* test: (1) deficient performance; and (2) resulting prejudice. This standard requires a habeas petitioner to demonstrate a reasonable probability that, but for counsel's alleged conflict, the outcome of the case would have been different. *Dansby,* 766 F.3d at 837.

Because there was no evidence of an "actual conflict," the Arkansas Supreme Court properly cited *Strickland* as the governing standard for Chatmon's claim. Further, the Court's application of *Strickland* was not objectively unreasonable, nor was it based on an unreasonable determination of the facts. The evidence in the record overwhelmingly supports the Arkansas Supreme Court's determination that Chatmon's "conflicts" with his trial attorney did not result in constitutionally ineffective assistance under the *Strickland* standard.

Despite Chatmon's complaints about her performance, his attorney continued to competently and vigorously represent him throughout his pretrial and trial proceedings. For example, she obtained several significant pretrial victories on his behalf, and she advanced many of his *pro se* arguments even though she disagreed with them. On several occasions, the trial court provided Chatmon opportunities to

present his *pro se* arguments and complaints about his attorney's representation. After hearing those arguments, and observing counsel's performance on Chatmon's behalf, the trial court found her performance was adequate in all respects and declined to grant Chatmon's request for a new attorney. Given these facts, Chatmon's attorney was under no affirmative obligation to "remove herself" from representing him.

Based on this record, Chatmon has failed to establish that his trial counsel's performance was objectively unreasonable, or that, if his trial counsel had removed herself from his case, there was a reasonable probability that the outcome of his criminal proceedings would have been different. Because the Arkansas Supreme Court's adjudication of this ineffective-assistance claim was not an unreasonable application of *Strickland* and did not involve an unreasonable determination of the facts in light of the state court record, the Court concludes that this habeas claim is without merit and should be dismissed.

### 2.    Trial Court's Alleged Error in Refusing to Appoint "Conflict-Free" Counsel or Conduct Adequate Inquiry (Claim 5)

Chatmon argues that his Sixth Amendment rights were violated by the trial court's refusal to appoint new counsel after his repeated complaints about the legal representation he was receiving and his "personal conflicts" with his trial counsel. He also argues that the trial court failed to conduct a hearing on his pretrial motion for new counsel, or to otherwise inquire into the factual basis for Chatmon's

"dissatisfaction, distrust and concern" when the conflict became apparent. Chatmon argues this forced him to proceed to trial with an attorney with whom he was in an "adversarial relationship." *Doc. 2 at 9; Doc. 6 at 9; Doc. 31 at 6, 16.*

Respondent argues that Chatmon has procedurally defaulted this claim because, while he raised it in his Rule 37 petition, the trial court did not address it in its order denying Rule 37 relief. Under well-established Arkansas case law, this precluded the Arkansas Supreme Court from reaching and deciding this issue in Chatmon's Rule 37 appeal: "Chatmon's failure to obtain a ruling on this claim precludes review by this court." *Chatmon Rule 37,* 2016 Ark. 126, at 8, 488 S.W.3d at 506. The Court agrees.

As "cause" to excuse his procedural default, Chatmon points to his lack of counsel in his Rule 37 proceedings. *Doc. 31 at 16.* While a habeas petitioner's *pro se* status in state post-conviction proceedings may excuse a procedural default in the narrow circumstances outlined in *Martinez v. Ryan,* 566 U.S. 1 (2012), this equitable exception only applies to defaulted claims of ineffective assistance of trial counsel, *not defaulted claims of trial court error. Dansby,* 766 F.3d at 833-34. Thus, Chatmon's *pro se* status in his Rule 37 proceeding does *not* excuse his procedural

default of the claim that the trial court erred in failing to appoint conflict-free counsel or conduct an adequate inquiry into his request for a new attorney.[25]

Accordingly, because Chatmon has procedurally defaulted this claim, it should be dismissed.

## H.    Chatmon's Claim of Judicial Bias (Claim 4)

Chatmon argues that his constitutional right to a fair trial was violated because the presiding judge: was "steeped in corruption" while presiding over his trial; was "prosecution-oriented"; and exhibited racial bias. In support of this claim, Chatmon cites the judge's subsequent removal from the bench for judicial misconduct, his federal bribery conviction, and his online comments that African-Americans should "use white ink in their tattoos." According to Chatmon, the trial judge exhibited his bias by failing to inquire into the factual basis of Chatmon's dissatisfaction with his counsel; by telling Chatmon to be quiet during trial; and by denying his request for a continuance to obtain Chambers as a witness. *Doc. 2 at 7; Doc. 6 at 7-8, Doc. 13 at 1-2, Doc. 31 at 13-15*.

Respondent argues that the Arkansas Supreme Court reasonably adjudicated these judicial bias claims in Chatmon's *coram nobis* proceedings. The Court agrees.

---

[25]In Chatmon's first *coram nobis* proceeding, the Court noted that whether the trial court's denial of his motion for new counsel was "incorrect" was an issue that should have been addressed on direct appeal or in a Rule 37 proceeding. *Chatmon ECN I,* 2015 Ark. 417, at 4-5, 473 S.W.3d at 545-46.

In denying Chatmon's first *coram nobis* petition, the Court held:

Chatmon first alleges that the judge, who had later entered a guilty plea to bribery charges concerning an unrelated civil case, was biased in favor of the prosecution. Chatmon asserts that the judge's failure to act on his *pro se* motion to have trial counsel relieved and new counsel appointed was evidence of this judicial bias. In his amended petition, Chatmon further elaborates on this claim, pointing to what he labels as additional instances of bias demonstrated by the judge.

To state a ground for the writ on the basis of judicial bias, a petitioner must show that there was a reasonable probability that he would not have been convicted if an unbiased judge had served, and an allegation of the mere appearance of impropriety is not sufficient. *Turner v. State,* 2012 Ark. 357, 2012 WL 4471217 (per curiam). A petitioner does not make the necessary showing of fundamental error to support relief where there is no demonstration of actual bias. *Id.; see also Trimble v. State,* 316 Ark. 161, 871 S.W.2d 562 (1994) (holding that it was not error to decline to issue the writ where there was an appearance of impropriety but the petitioner demonstrated no prejudice from the alleged bias).

Here, as this court noted in its opinion on direct appeal, there was substantial evidence of Chatmon's guilt. Chatmon points to only two specific actions by the trial judge, the failure of the judge to grant his motion for new counsel and the judge's failure to appoint counsel for a posttrial hearing on the issue of counsel's ineffective assistance, that would have had any bearing on the outcome of his trial. The remainder of this claim, including those allegations raised in the amended petition, sets forth only generalized assertions that Chatmon's trial was not fair because the judge exhibited an appearance of bias in favor of the prosecution through his actions in the unrelated civil case and through inappropriate comments made in social media.

…

To the extent that Chatmon contends that the court's denial of the motion for new counsel was incorrect and demonstrated bias, the issue was not one that was hidden, and it was addressed by the trial court. Such issues could have been addressed on appeal or in a proceeding under Criminal Procedure Rule 37.1. *See Westerman,* 2015 Ark. 69,

456 S.W.3d 374; *see also Echols v. State,* 354 Ark. 414, 125 S.W.3d 153 (2003).

*Chatmon ECN I,* 2015 Ark. 417, at 3–5, 473 S.W.3d at 545–46.

In his second *coram nobis* proceeding, Chatmon used information brought to light in Maggio's judicial disciplinary proceedings to expand on his earlier judicial bias claims. The Court held that the expanded claim was still insufficient to warrant relief:

Although Chatmon expanded his judicial-bias claim to include evidence of Maggio's racial bias, we rejected similar evidence of impropriety set forth in his first petition as insufficient to establish actual bias. *Chatmon,* 2015 Ark. 417, at 3, 473 S.W.3d at 545. Moreover, Chatmon has not shown that his claim of judicial bias is a ground for a writ of error coram nobis or that it establishes that there was a reasonable probability that the judgment of conviction would not have been rendered if an unbiased judge had served. *Id.* (citing *Turner v. State,* 2012 Ark. 357, at 3, 2012 WL 4471217 (per curiam)). Chatmon did not create a basis for issuance of the writ in his first petition, and his reassertion of essentially the same claims in the instant petition is a misuse of the remedy in that he has failed to allege any additional facts sufficient to establish actual bias or fundamental errors that invalidated his conviction.

Chatmon alternatively contends that his new allegations of racial bias entitle him to a writ of certiorari. … Allegations of conduct that give rise to an appearance of impropriety but that fail to show either a conflict of interest or actual bias are insufficient to demonstrate that the trial judge acted illegally or in excess of his jurisdiction such that the superintending authority of this court may be invoked through a writ of certiorari. *Turner v. State,* 2012 Ark. 357, at 7 (per curiam) (citing *Weaver v. Simes,* 365 Ark. 289, 229 S.W.3d 15 (2006); *Skokos v. Gray,* 318 Ark. 571, 886 S.W.2d 618 (1994)). Finally, Chatmon fails to demonstrate that there was no other remedy to redress his contentions that he was unfairly denied a continuance and the appointment of other counsel.

*Chatmon ECN II*, 2016 Ark. 236, at 4–5, 492 S.W.3d at 870–71.

The Due Process Clause requires "a fair trial in a fair tribunal," which includes "an absence of actual bias in the trial of cases." *In re Murchison,* 349 U.S. 133, 136 (1955). Application of this standard, when viewed through the "deferential lens" of § 2254(d), "necessarily leaves state courts considerable latitude" when addressing claims of judicial bias. *Jones v. Luebbers,* 359 F.3d 1005, 1012 (8th Cir. 2004). "This is especially true when the allegations of bias do not relate to pecuniary interests or procedural infirmities, but rather, relate to alleged personal animosity and instances of stern courtroom administration." *Id.* at 1013. Even a showing that a judge was "thoroughly steeped in corruption" does not "support a per se finding that every case over which he presided was infected." *Bracy v. Schomig,* 286 F.3d 406, 409-10 (7th Cir. 2002). Instead, a defendant "pressing a judicial bias claim must demonstrate that the judge was 'actually biased in petitioner's own case.'" *Id.* at 410. Absent a showing of "pervasive personal bias and prejudice," a judge's unfavorable rulings on various issues do not support a claim of judicial bias. *Holloway v. United States,* 960 F.2d 1348, 1351 (8th Cir. 1992).

The Arkansas Supreme Court's determinations that Chatmon failed to establish "actual bias" or "fundamental error," were not contrary to, or an

unreasonable application of United States Supreme Court precedent.[26] In addition, the rulings were not based on an unreasonable determination of the facts in light of the state court record.

The Arkansas Supreme Court, in denying *coram nobis* relief, made it clear that, absent a showing that Maggio was actually biased in Chatmon's case, his subsequent removal from the bench and bribery conviction were not sufficient to grant the writ. For the same reasons, it also fails to provide an adequate basis for granting federal habeas relief. Accordingly, this habeas claim is without merit and should be dismissed.

## I.   Chatmon's Remaining Claims of Prosecutorial Misconduct (Claims 6(d), 6(e), 6(f) and 6(g))

Chatmon raises the following prosecutorial misconduct claims: (1) the prosecutor failed to preserve and perform fingerprint testing on the wallet of one of the victims; (2) the prosecutor fabricated inculpatory evidence; and (3) the prosecutor failed to take remedial measures to mitigate the damaging effects of improperly admitted evidence. He also criticizes the police investigation, arguing that, because there was insufficient evidence to connect him to the crimes, he never

---

[26]To be entitled to § 2254(d) deference, the state's court's decision need not cite the applicable Supreme Court opinions, "so long as neither the reasoning nor the result" contradicts the governing precedent. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

should have been criminally charged. *Doc. 2 at 10; Doc. 6 at 10-11; Doc. 31 at 17-19; Doc. 84 at 4-5.*

Respondent argues that these claims are all procedurally defaulted because, although Chatmon raised them in his Rule 37 or *coram nobis* proceedings, he failed to raise them, as he was required to do, at trial and on direct appeal. The Court agrees.

To the extent that Chatmon blames his trial attorney for failing to raise and preserve these prosecutorial misconduct claims for appellate review, he has not established that counsel's failure to do so was constitutionally deficient under *Strickland.*

Chatmon's attorney questioned two officers about the wallet. They admitted that neither the wallet nor its contents was tested for fingerprints before it was returned to the victim. *Trial R. at 433, 484-86.* Both officers stated that it would have been difficult to obtain prints from the wallet due to the porous nature of the leather. *Id. at 434-36, 484-85*. Chatmon's attorney asked Det. David Short: "So, basically what you're telling us … there might have been fingerprints but there might not have been? Is that true?" He responded, "Yes, ma'am." *Id. at 485-86.* In her closing argument, she pointed out that the officers "just didn't try" to fingerprint the wallet or a debit card, even though there could have been fingerprints. *Id. at 539-40.*

A "state's failure to preserve evidence does not constitute a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory

value and comparable exculpatory evidence was not reasonably available to the defendant." *Boykin v. Leapley,* 28 F.3d 788, 793 (8th Cir. 1994); *see California v. Trombetta,* 467 U.S. 479, 488–89 (1984). Chatmon has failed to demonstrate either "bad faith" by the State, or that the testing of the wallet and its contents would have produced "exculpatory" evidence. Thus, nothing about this claim is sufficient to elevate it to a due process violation.

Because Chatmon does not explain what evidence was "fabricated," he has not shown that his trial attorney was ineffective for failing to make a prosecutorial misconduct argument on this basis at trial. Similarly, because Chatmon has not even satisfied the threshold requirement that any evidence was improperly admitted, he has not shown that his trial attorney was ineffective for failing to make an argument about the prosecutor's lack of "remedial measures." Thus, his trial counsel's failure to raise these arguments cannot provide a basis for excusing his procedural defaults of those two claims.

Finally, Chatmon's argument about the alleged inadequacies of the police investigation goes to the sufficiency of the evidence. On direct appeal, the Arkansas Supreme Court explicitly found that "substantial" circumstantial and direct evidence supported Chatmon's convictions. Thus, trial counsel's failure to raise a claim about the police investigation did not result in any prejudice and cannot provide a basis for excusing Chatmon's procedural default of this claim.

Accordingly, the Court concludes that, because Chatmon has procedurally defaulted Claims 6(d), (e), (f) and (g), they should be dismissed.

### III. Conclusion

IT IS THEREFORE RECOMMENDED THAT this 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus, *Doc. 2*, as amended, *Docs. 74 & 89*, be DENIED, and the case be DISMISSED, with prejudice. IT IS FURTHER RECOMMENDED THAT a Certificate of Appealability be DENIED. *See* 28 U.S.C. § 2253(c)(1)-(2); Rule 11(a), Rules Governing § 2254 Cases in United States District Courts.

DATED this 13th day of April, 2018.

_____
UNITED STATES MAGISTRATE JUDGE